IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAURICE LAMONT GORDON,<br><br>*Defendant.* | **UNDER SEAL**<br><br><br>Case No. 1:24-MJ-54 |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Simon Chu, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. This affidavit is being submitted in support of a criminal complaint charging MAURICE LAMONT GORDON with unlawfully, knowingly, and intentionally distributing a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, resulting in serious bodily injury or death, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

2. I am a Detective with the Prince William County Police Department ("PWCPD"). I have been employed as a police officer with the PWCPD since 2012. I have been assigned to the Vice/Narcotics Task Force since 2017. I am currently assigned to the Federal Bureau of Investigation ("FBI"), where I am federally deputized as a Task Force Officer ("TFO") with the FBI's Northern Virginia Safe Streets Task Force. As such, I am a law enforcement officer as defined under Section 2510(7) of Title 18, United States Code (*i.e.* an officer of the United States of a political sub-division thereof, who is empowered to conduct investigations of, and to make arrests

1

for federal offenses).  During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

3. During my time in law enforcement, I have investigated violations of federal and state narcotics laws.  I have conducted or participated in numerous investigations involving narcotics-related offenses, which have resulted in the seizure of illegal drugs, drug proceeds in the form of United States currency, weapons, and other evidence of criminal activity.  These investigations have led to the arrest and conviction of drug distributors and users in the General District, Juvenile and Domestic Relations, and Circuit Courts of Prince William County, Virginia, as well as in the Eastern District of Virginia.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers and abusers of controlled substances.  Through my employment, I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants, and cooperating witnesses, the controlled purchase of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interview, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.  I have testified in trials, in grand jury proceedings, and at preliminary hearings.  I have been certified as an expert in the distribution of narcotics in the Prince William County Courts.

4. Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones, and that communication can be made through verbal conversation, third party

communication applications, or the use of text messages between the two or more communicating parties' cellular telephones or other devices.  It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in these manners.  Additionally, I know that narcotics dealers frequently utilize social media platforms with messaging capabilities to communicate with associates.  The simultaneous use of various social media accounts is sometimes employed to avoid law enforcement detection.

5. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, interviews, cell phone downloads, results of search warrants, and other physical evidence obtained during the course of this investigation.

6. This affidavit is for the limited purpose of obtaining a criminal complaint and arrest warrant.  The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government regarding the investigation.

**BACKGROUND**

7. Based on my training and experience, I know that fentanyl is a schedule II controlled substance and is a synthetic opioid pain reliever that is typically used to treat severe pain.  Fentanyl is estimated to be 50 to 100 times more powerful than morphine, and like other opioids it has strong addictive potential.  In addition to legitimate pharmaceutical production, fentanyl is also being produced in clandestine labs domestically and abroad and distributed through traditional opioid drug distribution networks.

8. The most prolific form of fentanyl seen by law enforcement in this region in recent years is in the form of fake oxycodone pills containing fentanyl.  These counterfeit pills containing

fentanyl resemble 30 milligram Percocet[1] pills in that they are blue in color and bear the stamped markings of "M" contained within a square box on one side, and "30" on the other side. Drug users, dealers, and even the general public refer to these counterfeit pills by many slang terms, which include but are not limited to: "Percs," "Perc-30s," "Blues," "30s," "Ercs," or "Erks." "Perc(s)" is a commonly used slang term for counterfeit pills containing fentanyl because it is short for Percocet.

## SUMMARY OF PROBABLE CAUSE

### April 24, 2022 Overdose Death of V-1

9.      Since April 24, 2022, the Prince William County Police Department ("PWCPD") has been investigating the events which led to the fatal overdose of a 15-year-old male, who will hereinafter be referred to as Victim-1 ("V-1"). V-1 was a resident of the City of Woodbridge when he overdosed at his residence located in Woodbridge, Virginia. The investigation revealed that the distribution of the fentanyl pills to V-1, which subsequently caused his fatal overdose death, occurred in Woodbridge, Virginia, which is within the Eastern District of Virginia.

10.     On April 24, 2022, at approximately 5:54 PM, PWCPD members and Prince William County Emergency Medical Services ("EMS") members were dispatched to a residence in Woodbridge, Virginia for the report of a possible deceased individual. V-1 was found by his mother lying unresponsive on his bed within his bedroom. V-1's mother performed CPR on V-1 until EMS arrived on scene, at which time EMS pronounced V-1 deceased.

11.     At V-1's residence, PWCPD Officer Correia maintained scene security. PWCPD detectives responded to the scene and observed V-1's body on the bed in V-1's bedroom. Also located on the bed were items of narcotics paraphernalia to include burnt aluminum foil and a rolled U.S. currency bill. Detectives also recovered a cell phone from V-1's bedroom. V-1's

---

[1] Based on my training and experience, Percocet is a brand name for a pain reliever tablet that contains the opioid Oxycodone and non-opioid Acetaminophen.

mother identified the cell phone as belonging to V-1 and provided a working passcode to the phone. All items were recovered on top of V-1's bed, near to where V-1's body was located. The items of paraphernalia were collected as evidence and submitted to the PWCPD's property and evidence section.

12. I know from my training and experience that the types of paraphernalia located in V-1's bedroom are commonly utilized to smoke counterfeit pressed pills containing fentanyl.

13. On April 28, 2022, PWCPD transferred custody of the paraphernalia evidence recovered from V-1's bedroom—two pieces of burnt foil and a rolled U.S. currency bill—to the Drug Enforcement Administration (DEA). The foil and dollar bill were submitted to DEA Mid-Atlantic Laboratory for testing. On April 29, 2022, the Mid-Atlantic Laboratory confirmed that one of the items of paraphernalia contained fentanyl residue.

<u>W-1 Interview</u>

14. During the investigation, a friend of V-1 was identified as being involved in the distribution of counterfeit pills containing fentanyl to V-1. That individual will hereinafter be referred to as Witness-1 ("W-1"). On September 28, 2022, W-1 was advised of his *Miranda* rights by your Affiant and spoke with law enforcement. During the interview, W-1 refers to the supplier of the counterfeit pills containing fentanyl as "Mo." Following an interview with W-1 and through the use of law enforcement databases, "Mo" was ultimately identified as Maurice Lamont GORDON (hereinafter referred to as "GORDON"). A photograph of GORDON was later obtained from a law enforcement database and shown to W-1. W-1 positively identified the picture of GORDON as "Mo."

15. W-1 was aware of V-1's death at the time of the interview and described the following sequence of events that led to the distribution of counterfeit pills containing fentanyl—which W-1 referred to as "Percs"—to V-1:

- W-1 confirmed that W-1 facilitated a deal with GORDON, in which V-1 provided money to W-1 to purchase a quantity of "Percs" from GORDON.

- W-1 only knew GORDON by the name "Mo."

- W-1 was unsure of the exact date that he purchased "Percs" from GORDON, but believed it was 1-3 days prior to V-1's death.

- W-1 met V-1 at the 7-Eleven, located at 13990 Richmond Highway, Woodbridge, Virginia 22191. The meeting was not planned, and W-1 described the location as an open-air drug market that promoted loitering, drug use, and sales. This location is well known to law enforcement to be an open-air drug market as described by W-1.

- W-1 did not own a cell phone at the time of the purchase of "Percs" from GORDON, shortly before V-1's death. W-1 therefore utilized V-1's cell phone to contact GORDON and arrange for the purchase of "Percs" from GORDON. W-1 provided the phone number for GORDON from memory as 571-XXX-7932 ("hereinafter GORDON'S PHONE").

- W-1 identified GORDON'S address as 1384 E. Longview Dr. #5 Woodbridge, Virginia 22191, and stated that GORDON sold the "Percs" to W-1 from that residence.

- W-1 stated that W-1 and V-1 walked from the 7-Eleven to GORDON'S residence. V-1 provided W-1 a quantity of money for the "Percs." V-1 remained outside of GORDON'S apartment building as W-1 conducted the purchase of "Percs" from GORDON. W-1 entered the apartment building and completed the deal near the doorway of GORDON'S residence. W-1 exchanged an amount of U.S. currency for a quantity of "Percs" from GORDON.

- Following the purchase of "Percs" from GORDON, W-1 immediately returned outside and provided V-1 with V-1's share of the "Percs" purchased from GORDON.

- W-1 and V-1 walked a short distance where W-1 smoked a portion of the "Percs" from W-1's supply that was just purchased from GORDON, and W-1 allowed V-1 to take a couple of "hits" from the "Percs." W-1 and V-1 left the area approximately 15 minutes later, and W-1 confirmed that V-1 left with at least one "Perc" that was purchased from GORDON in his possession.

- At the time of the interview, W-1 stated that GORDON no longer resided at 1384 E. Longview Dr. #5 and advised that GORDON had moved out of that location several months prior.

Cell Phone Analysis and Location Data

16. V-1's cell phone, which utilized telephone number 571-XXX-2898, was forensically extracted and analyzed by investigators from the PWCPD. The download of V-1's cell phone was examined for any information pertaining to the source of supply of fentanyl pills. During the analysis of V-1's phone, investigators located a phone call that took place between V-1's phone and GORDON'S PHONE on April 23, 2022, at approximately 7:30 PM. The record of this phone call is consistent with W-1's statements regarding the series of events that led to the purchase of "Percs" pills from GORDON shortly before V-1's death. The phone call to GORDON'S PHONE was the last active phone call logged in V-1's phone prior to V-1's death.

17. When interviewed by law enforcement following V-1's death, V-1's mother reported that on April 23, 2022, at approximately 4:30 PM, a family member of V-1 dropped V-1 off at a local barbershop. V-1's mother reported that the barbershop was located near the El Ranchon restaurant, located at 13638 Richmond Highway #2005, Woodbridge, Virginia 22191, in

the Potomac Plaza shopping center. V-1's mother further reported that V-1 did not return home until approximately 8:30-9:00 PM on April 23, 2022. V-1's mother stated that V-1 did not leave the residence after returning home, and she reported that she last saw V-1 at approximately 9:30 PM on April 23, 2022.

18. In order to confirm the series of events described by W-1 and V-1's mother, your Affiant obtained cell phone location data for V-1's phone and GORDON'S PHONE. On May 4, 2022, your Affiant obtained a search warrant from Prince William County Magistrate Jurack related to the historical data of V-1's phone number, 571-XXX-2898, to include location data. On October 11, 2022, your Affiant obtained a search warrant from Prince William County Circuit Court Judge Willett related to the historical data of 571-XXX-7932 (GORDON'S PHONE), to include location data.

19. Analysis of the historical cell phone location data of V-1's phone and GORDON'S PHONE revealed their respective cell phones utilized cell phone towers that provided coverage to the below-listed locations at times that are consistent with W-1 and V-1's mother's statements to law enforcement regarding the events of April 23-24, 2022. The below chart illustrates some of the location data analysis that was performed by law enforcement in this case:

| PERSON(S) WHOSE CELL PHONE RECORDS SHOW UTILIZED CELL TOWER | TIME | LOCATION THAT CELL TOWER PROVIDED CELL COVERAGE TO | RELEVANT EVENT RELATED TO TIME AND LOCATION |
|---|---|---|---|
| V-1 | 04/23/22: 4:49 PM – 5:51 PM | Potomac Plaza Shopping Center located at 13638 Richmond Hwy, Woodbridge, Virginia 22191 | V1 is dropped off near the barbershop by a family member |
| V-1 | 04/23/22: 6:00 PM – 6:10 PM | 7-Eleven located at 13990 Richmond, Woodbridge, Virginia 22191 | V-1 and W-1 meet at the 7-Eleven |

8

| V-1 and GORDON | 04/23/22: 7:30 PM – 7:36 PM | GORDON'S residence located at 1384 E. Longview Dr. Woodbridge, Virginia 22191 | Location of the distribution of fentanyl pills by GORDON to W-1 and V-1 |
|---|---|---|---|
| V-1 | 04/23/22: 8:03 PM – 10:38 PM | V-1's residence (Address omitted) | V-1 returns home and remains at his residence |

20. Based on my training, experience, and knowledge of this investigation, the above location data is consistent with V-1's mother's report that V-1 went to a barbershop at the Potomac Plaza Shopping Center on the afternoon of April 23, 2022 and did not return home until approximately 8:30-9:00 PM. This location data is also consistent with W-1's statements that W-1 met V-1 at the 7-Eleven located at 13990 Richmond Highway before travelling to GORDON'S residence to purchase "Percs" from GORDON.

V-1 Autopsy and Cause of Death

21. Assistant Chief Medical Examiner Dr. Meghan S. Kessler, Virginia Office of the Chief Medical Examiner, was the forensic pathologist who performed the autopsy on V-1. Dr. Kessler ruled that V-1's manner and cause of death was Accidental Fentanyl Intoxication.

22. Dr. Carol L. O'Neal, a Forensic Toxicologist with the Virginia Department of Forensic Science, conducted a chemical analysis on V-1's subclavian blood that was collected during his autopsy. The analysis of V-1's subclavian blood showed the presence of 0.015mg/L of fentanyl and an unquantified amount of despropionylfentanyl. I know from my training and experience that despropionylfentanyl is a metabolite of fentanyl. No other drugs or alcohol were present within V-1's subclavian blood sample or within a sample of V-1's vitreous humor.

Search Warrant of GORDON'S Residence & GORDON'S Arrest

23. In August 2022, the PWCPD received an anonymous drug complaint that reported

"drug deals/activity" were taking place in the area of Armstead Street in Woodbridge, Virginia. During the month of September 2022, on multiple separate occasions, PWCPD Detective Calton conducted surveillance at the residential address of 1402 E St. Woodbridge, Virginia (hereinafter "GORDON'S RESIDENCE") and observed GORDON entering and exiting the residence freely. Additionally, Detective Calton witnessed multiple instances of short-term vehicle traffic involving GORDON that was consistent with narcotics distribution.

24. In October 2022, a former Narcotics TFO and your Affiant responded to the area of GORDON'S RESIDENCE and also witnessed activity consistent with narcotics distribution. The former TFO observed GORDON entering and exiting GORDON'S RESIDENCE freely, and observed short-term traffic consistent with a narcotics transaction involving GORDON and an individual who came to GORDON'S RESIDENCE. On a separate occasion in October 2022, your Affiant observed GORDON conducting a hand-to-hand transaction consistent with a narcotics transaction outside of GORDON'S RESIDENCE.

25. On October 11, 2022, based in part on the above information, your Affiant obtained a search warrant from Prince William County Circuit Court for GORDON'S RESIDENCE. On October 12, 2022, your Affiant obtained an arrest warrant for GORDON from Prince William County Magistrate Crum charging GORDON with distribution of a schedule I/II substance related to the overdose death of V-1.

26. On October 12, 2022, law enforcement attempted to take GORDON into custody based upon the outstanding arrest warrant. GORDON fled on foot back inside GORDON'S RESIDENCE but surrendered shortly thereafter and was taken into custody without further issues.

27. GORDON was immediately advised of his *Miranda* rights upon being taken into custody. During a search incident to arrest, numerous counterfeit pills containing fentanyl were recovered from GORDON'S person. During his arrest, GORDON stated to your Affiant, "yea,

I'm selling drugs. I know that whatever." When asked if any narcotics-related items located within GORDON'S RESIDENCE belonged to any of the other residents of the home, GORDON responded that "everything in there is mine." GORDON further claimed ownership of a firearm, directed your Affiant to its location, and described the firearm as pink and blue in color.

28. During the execution of the search warrant on GORDON'S RESIDENCE, law enforcement seized marijuana, cocaine, one pink and blue loaded handgun, ammunition, and a large quantity of counterfeit pills containing fentanyl.

29. The firearm recovered during the search of GORDON'S RESIDENCE did not have a serial number on it and is commonly referred to as a "ghost gun." Based on my training and experience, I know that ghost guns are typically partially homemade or home-assembled firearms and are often illicitly sold and possessed. The ghost gun recovered from GORDON'S RESIDENCE was located in the bottom dresser drawer in the basement bedroom, as described by GORDON. A large quantity of counterfeit pills containing fentanyl were strewn across the bed that was located directly next to the dresser that contained the ghost gun.

30. GORDON was transported to the PWCPD Central District Station, where he was again advised of his *Miranda* rights and spoke with your Affiant and FBI Special Agent Shane Dana. GORDON disclosed the following information of note during his interview:

- GORDON previously resided at 1384 E. Longview Dr., #5, Woodbridge, Virginia, 22191, where he had lived with his girlfriend on a one-year lease. He then moved to the E Street address, where he had been living for 5-6 months.

- GORDON admitted to selling powder cocaine, crack cocaine, "Percs," and marijuana. GORDON began selling Percs while residing at 1384 E. Longview Dr. #5.

- GORDON purchased "Percs" by the "K-Pack," which is a term that references

11

- a quantity of 1,000 pills. GORDON stated that it typically took him about one week to sell an entire "K-Pack."

- GORDON stated the price he paid for a "K-Pack" would vary, but that he had paid $2,200 for the "K-Pack" that was recovered from his residence.

- GORDON stated that he paid $500 for the ghost gun that was recovered from his residence.

- GORDON was shown a picture of W-1 and GORDON admitted to selling W-1 "Percs" on multiple occasions while residing at 1384 E. Longview Dr. #5.

31. Based on GORDON'S statements during his interview, it is estimated that he purchased more than 25,000 counterfeit pills containing fentanyl for eventual redistribution for profit.

32. The counterfeit pills containing fentanyl recovered from GORDON'S person and GORDON'S RESIDENCE were submitted to the DEA Mid-Atlantic Laboratory for testing. In late February and early March of 2023, the Mid-Atlantic Laboratory confirmed that the pills seized from GORDON'S person and GORDON'S RESIDENCE contained fentanyl, a Schedule II controlled substance, and Acetaminophen. The total number of fentanyl pills recovered from GORDON'S person and GORDON'S RESIDENCE on October 12, 2022 was 1,159 pills, with a total combined weight of approximately 131.66 grams.

## CONCLUSION

33. Based upon the foregoing, I submit that there is probable cause to believe that on or about April 23, 2022, in the County of Prince William, within the Eastern District of Virginia, the defendant, Maurice Lamont GORDON did distribute a mixture and substance containing a detectable amount of fentanyl, a schedule II controlled substance, resulting in death or serious bodily injury, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

34. Wherefore, I respectfully request that this Court issue a criminal complaint charging Maurice Lamont GORDON with a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

Respectfully submitted,

*S. Chu / 2388*

Simon Chu
Task Force Officer
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 via telephone this 16th day of February, 2024.

*William E. Fitzpatrick*
The Honorable William E. Fitzpatrick
United States Magistrate Judge